# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00417-CV

**Paul M. Werchan and Mary A. Werchan, Appellants**

**v.**

**Lakewood Estates Association, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-GN-06-003980, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Dr. Paul Werchan and Mary Ann Werchan appeal a district court judgment declaring that they have no rights in a waterfront park owned by appellee Lakewood Estates Association (LEA) and granting injunctive and declaratory relief prohibiting them from installing or maintaining a boat dock or other improvements there. We will affirm the judgment.

### BACKGROUND

The waterfront park at issue is located in Lakewood Estates, a subdivision on the south shore of Lake Travis near the Briarcliff community. In 1971, appellant Mary Ann Werchan, with her late husband, Leroy Werchan, purchased a lot in Lakewood Estates. They bought a second lot in 1974. Leroy constructed a weekend or summer home on the site. After Leroy died in 1997,

his son, appellant Paul Werchan, inherited Leroy's interests in his Lakewood Estates property. We will refer to Mary Ann, Leroy, and Paul Werchan simply as "the Werchans" except where the distinction is relevant.

The original Lakewood Estates subdivision plat, recorded in 1947, set aside land for a waterfront park (the "Park")—the property at issue here. In 1948, the developer recorded a document titled, "Restrictions," and subtitled "Lakewood Estates." In addition to imposing several deed restrictions of Lakewood Estates lots, the Restrictions, in paragraph 14, "stipulated that all purchasers and owners of tracts in Lakewood Estate shall have permanent use of the waterfront park and roads in Lakewood Estate, as shown on recorded plat of said addition." However, paragraph 15 of the Restrictions, the concluding paragraph, stated, "These restrictions shall remain in force and shall remain effective until June 1st, A.D. 1973."

The lakeshore at the Park is rocky and, in places, steep. Over the years, several Lakewood Estates property owners have anchored private floating docks off the Park shore, providing better access to the lake for swimming, boating and other water recreation. The Werchans moored a dock at the Park as early as 1971; there was evidence that they were the first persons to do so. In 1979, the Werchans, with five other families who were fellow Lakewood Estates property owners, purchased a fifty-six by thirty-four foot floating boat dock[1] and attached it by two cables to Park property. One cable is attached to a stake, the other to a tree. The dock has remained there,

---

[1] Photographs of the dock are in the record. It is a covered structure, with what appear to be wooden floors and three slips for watercraft. There was also evidence that the Werchans' dock was sufficiently large to constitute a "residential marina" under Lower Colorado River Authority regulations.

moored by the same two cables to the same stake and tree, ever since. Throughout the dock's existence, a sign has been posted on the structure itself stating, "Private dock. Keep off." In 1997, after Leroy died, Paul inherited his interest in the dock. Meanwhile, the Werchans gradually purchased each of their co-owners' shares of the dock, ultimately acquiring sole ownership in 2001.

In 1980, the dock owners installed an electrical outlet near the dock. They obtained service through a meter box located in a utility easement in the Park approximately 400-450 feet inland. From the meter box, the dock owners ran wires underground through a trench they dug to a location near the dock. Here they set an electric pole in concrete, and ran the wires up the pole to an outlet with a locking cover. When desiring electricity on the dock, the owners would turn the power on back at the meter box, then run an extension cord to the dock from the outlet, and reverse the process when they left. The electric pole remained intact in that location from 1980 until 2002, when it was destroyed in a flood. Flood waters prevented reinstallation until 2005.

Until 1995, title to the Park remained in the Lakewood Estates developer and his heirs. The developer had made no provision for a property owners association or similar entity to manage or maintain the Park. In 1969, a group of subdivision residents formed a non-profit voluntary association, the Lakewood Property Owners Protective Association (POPA). POPA's articles of association indicated that its purposes included raising funds to pay for construction and maintenance of a boat ramp in the Park that some residents had previously built. The articles stated that the organization would charge fees for access to the ramp. In the years that followed, POPA functioned essentially as a voluntary neighborhood or homeowners association for Lakewood Estates property owners, providing a forum for addressing residents' issues, coordinating volunteer

3

efforts to maintain or improve the Park, and funding these and other services through voluntary membership dues. POPA also paid property taxes on the Park. There was also evidence that POPA board members undertook efforts to limit access to the Park solely to Lakewood Estates property owners, including erecting signs at the Park advising that access was limited to the subdivision's property owners and guests only. The parties hotly disputed, however, whether POPA went further in attempting to limit Park access solely to its dues-paying members. The Werchans joined POPA after purchasing their first lot, paid annual dues for each year at least through 1993, and were active in the association, with Mary Ann serving as the group's treasurer and secretary between 1981 and 1991.

POPA's articles of association provided for a twenty-five year term of existence, which ended in June 1994. The articles were not renewed. However, in December 1994, a group of Lakewood Estates residents formed appellee LEA, a Texas non-profit corporation, for purposes including "represent[ing] the common interest of owners of real property situated in LAKEWOOD ESTATES" and "assist[ing] in the enforcement of subdivision restrictions and other rules and regulations imposed by governmental authority so as to protect and enhance the value of property within the subdivision." Like POPA, LEA functioned similarly to a voluntary neighborhood association for subdivision residents, funding its activities with voluntary annual membership dues. The Werchans were dues-paying members of LEA each year from 1997 through 2006, when litigation arose.

On June 1, 1995, LEA purchased the fee title in the Park from the heir to Lakewood Estates' developer, and thus became the owner of the Park. LEA undertook formal measures to

restrict Park access to dues-paying LEA members, enacting a bylaw change in 1998[2] and, in the same year, providing new signs for the Park advising that access was restricted to LEA members only.

The immediate dispute arose after the LEA membership voted in 2005 to approve new rules regulating private docks attached to Park property. The Werchans, as LEA members, attended two LEA meetings at which the rule proposals were discussed—in 2000 and 2005—and Paul Werchan spoke in opposition to the rules on both occasions. As adopted, LEA's dock rules require that each owner desiring to place a private dock in the Park area must sign an annual license agreement and pay an annual fee based on the dock's square footage. Among other terms of the "Licensing Agreement," the dock owner agrees that he "has no rights, interests, titles, estate or privileges related to or in the [Park]" beyond the "limited privileges" "temporarily allowed" under the agreement; that he would place his dock in a space designated by LEA; that the license was conditioned on his maintaining current LEA membership; that the owner would pay the license fee; that changes to the dock required LEA board approval; and that the agreement was terminable at will and would automatically terminate "when the licensee uses the property of the Licensor beyond the scope of authority granted herein."[3]

---

[2] LEA later rescinded this change on procedural grounds in 2000.

[3] There was evidence that at least some individuals in the LEA leadership had expressed concerns as early as 1995 regarding the unrestricted anchoring of private docks on Park property. These concerns included adverse effects on safety and a perception that it was unfair to allow a small number of longtime Lakewood Estates property owners who had previously placed docks along the waterfront essentially to monopolize the entire subdivision's lake access. The record reflects that the number of docks at the Park had grown steadily, increasing from five docks in 1980 to twelve by time of trial. Paul Werchan, among other witnesses, indicated that there was little if any room left at the Park for additional docks. The record also suggests that these impetuses for change corresponded to an evolution of Lakewood Estates' demographics from chiefly "weekenders" (as the Werchans were) to full-time residents and a change in the LEA board's composition from dock owners to non-dock owners.

Although each of the other dock owners signed the licensing agreement and paid the fee, the Werchans, while renewing their LEA membership for 2006, refused to sign the agreement or pay the fee. They took the position that they were not subject to any LEA restrictions or rules regulating their dock because they possessed either a fee interest or easement, by express grant or prescription, permitting them to continue mooring their dock to the Park and receiving electrical service from their electric pole, as they had in years past, without interference or restriction from LEA.

LEA sued the Werchans under the Uniform Declaratory Judgments Act (UDJA),[4] seeking declarations that the Werchans had no fee or easement interest in the Park, as well as declaratory and injunctive relief prohibiting the Werchans from installing or maintaining a boat dock or improvements on any portion of the Park. The Werchans counterclaimed under the UDJA for declarations establishing their rights to continue maintaining their dock, its mooring cables connecting it to shore, and their electrical outlet.[5] Of relevance to this appeal, the parties joined issue

---

At trial, Paul Werchan suggested the LEA leadership had more sinister motives, condemning a "good old boy system" he perceived among LEA board insiders who, in his view, were angling to drive away longtime dock owners "to create room so that special people in the know could now put their own docks out there." Dr. Werchan also accused the LEA leadership of "dirty tricks" including "[n]ot notifying us of meetings in time for us to make arrangements," "damaging my dock for months and months on end without offering any sort of apology or anything," and even disconnecting the Werchans' electric wires from their meter box in the Park and running wires from the box to an LEA-owned pavilion.

[4] Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008).

[5] At trial, the Werchans also claimed that they had established prescriptive easements with regard to improvements they helped make in the Park, including a road they helped build in 1978 from the POPA boat ramp to the area where they later moored their dock, a small boat ramp they helped build nearby in the same year, and nearby concrete steps they helped build in 1979. They do not press these claims on appeal.

6

regarding (1) whether paragraph 14 of the 1948 Restrictions, granting "permanent use of the waterfront park" to subdivision residents, had remained in effect or terminated, per paragraph 15, in 1973; (2) assuming any rights the Werchans possessed under paragraph 14 had not terminated, whether the LEA had nonetheless extinguished them through adverse possession; (3) whether the Werchans had established a prescriptive easement permitting them to continue using the Park property for mooring their dock and receiving electricity, as they had in years past, without restriction from the LEA.[6]

Following a bench trial, the district court rendered judgment in LEA's favor. The judgment declared that:

- the Werchans "have neither a fee interest nor an easement interest of any type in or to any portion of the [Park]"

- "the rights claimed by the Werchans under Paragraph 14 of the Restrictions terminated along with the Restriction[s] as a whole on June 1, 1973, pursuant to Paragraph 15 of the Restrictions"

- "if the rights claimed by the Werchans under Paragraph 14 of the Restrictions terminated along with the Restrictions as a whole on June 1, 1973, they were extinguished through [LEA's] adverse possession of them"

- "if the rights claimed by the Werchans under Paragraph 14 of the Restrictions did not terminate on June 1, 1973 and were not extinguished through [LEA's] adverse possession of them, such rights do not in any event include the right to install a boat dock or other improvements in the Park."

---

[6] The parties also asserted competing attorney's fees claims under the UDJA, but agreed to abandon them at trial.

7

The district court also rendered judgment that the Werchans take nothing on their counterclaims, and permanently enjoined them from "installing or maintaining a boat dock (including their existing dock) or any other improvement on any portion of the park without the Association's express permission." This appeal ensued.

## ANALYSIS

In two issues, the Werchans contend that the district court erred in declaring they had no interest of any kind in the Park, rendering judgment that they take nothing on their counterclaims, and permanently enjoining them from installing or maintaining a boat dock or any other improvement on any portion of the Park without LEA's express permission. They advance essentially three arguments. In their first issue, they urge that the district court erred in holding that their rights under paragraph 14 of the 1948 Restrictions had terminated, pursuant to paragraph 15, in 1973. If we agree with them and reverse the district court's judgment that paragraph 14 terminated in 1973, the Werchans assert, in their second issue, that there is legally or factually insufficient evidence to support the district court's alternative holding that LEA extinguished those rights through adverse possession. We "do[] not need to reach this contingent issue," the Werchans explain, unless we hold that paragraph 15 did not terminate paragraph 14 along with the other Restrictions.

Also, as part of their first issue, the Werchans challenge the legal and factual sufficiency of the evidence supporting the district court's legal conclusion, implicit in its judgment, that the Werchans did not establish a prescriptive easement permitting them to continue using the Park property to moor their dock and maintain an electric pole. We observe that, even if we

8

sustain their contentions regarding paragraph 14 of the Restrictions, the Werchans still must also prevail on this challenge in order to obtain appellate relief from the judgment prohibiting them from maintaining their dock moorings and electric pole in the Park. At trial, the Werchans took the position that their uses of Park property to moor their dock and maintain an electric pole were not within the scope of any permissive use authorized by paragraph 14. Consistent with this position, the Werchans on appeal have not challenged the district court's alternative holding that "if the rights claimed by the Werchans under Paragraph 14 of the Restrictions did not terminate on June 1, 1973, and were not extinguished through [LEA's] adverse possession of them, such rights do not in any event include the right to install a boat dock or other improvements in the Park." Consequently, regardless of whether paragraph 14 did or did not terminate, the Werchans' specific right to maintain their dock, mooring cables, and electric pole outlet in the Park ultimately turns on whether they have established a prescriptive easement entitling them to that right. We turn to that question first, as these specific uses are at the heart of the controversy.

**Prescriptive easement**

The Werchans challenge the legal and factual sufficiency of the evidence supporting the district court's conclusion that they did not establish a prescriptive easement permitting them to continue attaching their dock's mooring cables and maintaining their utility pole in the Park. As the parties asserting the right to a prescriptive easement, the Werchans had the burden of proving each element required to establish one; namely, that they have so used the Park in a manner that is (1) open, (2) notorious, (3) continuous, (4) exclusive, (5) adverse, and (6) for a period of ten years

9

or more. *See Brooks v. Jones*, 578 S.W.2d 669, 673 (Tex. 1979); *Scott v. Cannon*, 959 S.W.2d 712, 721 (Tex. App.—Austin 1998, pet. denied).

To prevail on their legal-sufficiency challenge, the Werchans must demonstrate that the evidence conclusively established each of these elements as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 814-17 (Tex. 2005). In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the district court's findings of (or failures to find) these elements and indulge every reasonable inference that would support them. *Id.* at 822. Similarly, to prevail on their factual-sufficiency challenge, the Werchans must demonstrate that the district court's adverse findings are against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 241. We must consider and weigh all of the evidence, and can set aside a finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*.

There is no dispute that the Werchans' use of Park property to moor their dock and obtain electrical service has been open, notorious, and continuous for more than ten years. The parties' dispute, rather, centers on the elements of exclusivity and adversity. The exclusivity element requires that the claimant's use be exclusive of all other persons, especially the property owner. *See Brooks*, 578 S.W.2d at 674 ("While other jurisdictions do not require the prescriptive use to be exclusive by use of the owner of the land, this rule of property has long been the established rule in Texas."); *Scott*, 959 S.W.2d at 721-22. The adversity element required to establish a prescriptive

10

easement is the same required to prove adverse possession. *Id*. at 722. It requires that a claimant must have asserted a "claim of right" in the land in question for the requisite period. That is, the claimant must intend to obtain a permanent right to do what the claimant is doing on the other person's land. *See Ellis v. Jansing*, 620 S.W.2d 569, 571-72 (Tex. 1981). This "does not require an intention to dispossess the rightful owner, or even know there is one." *See Minh Thu Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam). What it does require is intent to permanently appropriate the right in the land "as one's own to the exclusion of all others; '[m]ere occupancy of land without any intention to appropriate it will not support the statute of limitations.'" *Id.* (quoting *Ellis*, 620 S.W.2d at 571 (quoting *Wright v. Vernon Compress Co.*, 296 S.W.3d 517, 522 (Tex. 1956))). For example, possessing or using property in the mistaken belief that one owns or has a right in it will not give rise to prescription if unaccompanied by intent to appropriate that right. *See Ellis*, 620 S.W.2d at 571-72 (no evidence of adverse possession where claimant's predecessor possessed strip of neighbor's property but "never claimed or intended to claim any property other than that described in his deed, or what he thought was contained in his deed, and he never intended to claim any property owned by the abutting property owners").

The claim of right must also be "hostile," or one whose outward manifestations are of such nature and character as to notify the true owner that the claimant is asserting a claim in the land inconsistent with the claims of the owner. *See Scott*, 959 S.W.2d at 722. "As this Court has stated, there must be a *distinct* and *positive assertion* of a right which is brought to the servient owner's attention and which is hostile to the owner's rights." *Id.* (citing *Wiegand v. Riojas*, 547 S.W.2d 287, 289 (Tex. Civ. App.—Austin 1977, no writ)).

11

One implication of these principles is the longstanding rule that "the use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription." *Vrazel v. Skrabanek*, 725 S.W.2d 709, 711 (Tex. 1987) (citing *Othen v. Rosier*, 226 S.W.2d 622, 626 (Tex. 1950)). When the original use of the land in controversy is permissive, it is presumed that the continued use thereof is also permissive in the absence of notice to the true owner of the claimant's repudiation of the permissive use and assertion of an adverse claim. *See Commander v. Winkler*, 67 S.W.3d 265, 270 (Tex. App.—Tyler 2001, pet. denied); *see also Scott*, 959 S.W.2d at 722-23 (recognizing that "independent acts to show adversity" beyond mere continued use of road could "transform permissive use" of road "into an adverse use").

The district court heard evidence that was legally and factually sufficient to support its failure to find that the Werchans met the adversity and exclusivity elements of their prescriptive-easement claim. Much of the evidence was to the effect that, over the years, the Werchans relied on what they perceived to be a right to use the Park in common with other Lakewood Estates property owners—not, as the Werchans must prove, that they intended to permanently appropriate, for their exclusive, personal use, the portions of the Park where they have moored their dock and erected their electric pole.

Mary Ann Werchan testified that when the Werchans first purchased a lot in Lakewood Estates in 1971, they "thought we saw in those restrictions that we'd have a permanent use of the park." She was then immediately asked about the first dock they attached to the Park later that year, and testified that the Werchans "[a]bsolutely" thought they were entitled to place the dock there. Both Mary Ann and Paul Werchan testified that the Werchans did not thereafter communicate

12

with Lakewood Estates' developer or his heirs, who then had title to the Park, before mooring their second dock in 1979 and erecting the electric pole in 1980.

Although repeatedly questioned at trial both by counsel and the district court, Ms. Werchan could not recall any instance in which the Werchans told anyone, prior to the 2006 onset of litigation, that they were claiming a personal easement in the Park. There was also evidence that when the Werchans attended the 2000 and 2005 LEA meetings at which the proposed dock rules were discussed, the objections voiced by Paul Werchan did not include a claim that the Werchans had an easement in the Park permitting them to continue using the property in the same manner. Ms. Werchan recounted that they told LEA "they do not have the right to do that, to charge us fees and all of that because we were told we had permanent use of the waterfront. And permanent is permanent, as far as we were concerned." Other attendees testified that Paul's concerns in 2000 were limited to a notice issue—he claimed the board had failed to mail notice of the dock rules discussion to the Werchans (deliberately, he suggested at trial)—and that his concerns in 2005 were limited to his objections to paying the fee.

The Werchans emphasize what they term "two absolute demarcation points where the Werchans' and the servient estate owner's rights came to a head and the latter became fully aware of the claims made by the Lakewood Estates property owners, including the Werchans, regarding their existing right to use the Park." The first occurred in the 1980s. Joe T. Gibbs, the original developer of Lakewood Estates, died in 1971. Following the death of Gibbs's wife in February 1983, Gibbs's son, Dr. Joe T. Gibbs, Jr., who apparently desired to build a house there, began asserting a claim to the Park, taking the position that any rights in the Park conferred by

13

paragraph 14 of the 1948 Restrictions had terminated in 1973. Dr. Gibbs and his wife attended a POPA meeting in October 1983 at which Mary Ann Werchan, as POPA secretary, took notes. According to Ms. Werchan's notes, "They were trying to make a claim to the park, and apparently, they were coming there to try to give a history and make their claim to the Association." The POPA board appointed a committee to study the matter, and the POPA board meeting minutes reflect a series of meetings in which the board assessed its legal options.

At a February 1985 meeting, Lakewood Estates property owners voted to authorize POPA's president, Eugene R. Wissen, to sign and file an affidavit on their behalf. Wissen did so in 1985. Wissen averred, in relevant part:

> I and other purchasers of lots in Lakewood Estates purchased and took possession of such lots in reliance upon the Plat . . . and made expensive, extensive, and valuable improvements to such lots in reliance thereon and with full knowledge of Joe T. Gibbs and his family.
>
> As a result of the foregoing, I and other owners of lots in Lakewood Estates have used and utilized the Roads and the Park shown on the Plat continuously since acquiring such lots. Specifically, the Park has been used for the following purposes: Family reunions and other family outings; picnics; meetings of the Lakewood Property Owners Protective Association; company functions; mooring of docks and access to docks, fishing, and other general recreational uses.
>
> Accordingly, I and all other lot owners in Lakewood Estates have claims and do hereby claim easements appurtenant to our respective lots to utilize the Roads for ingress and egress and to utilize the Park for recreational purposes and the normal uses associated with Park land.

Thereafter, the matter was not resolved until July 1995, when Dr. Gibbs's son and heir ultimately conveyed the Park to LEA.

14

The Werchans' second "absolute point of demarcation" is an article in a September 1995 LEA newsletter discussing "What to Do About Docks and Park," including the "need to take formal action to control their property, to preclude any action in the future about property owners' claims or prior rights of use." The Werchans view this article as evidence that LEA was on notice of their prior use and the potential that its property rights were being appropriated.

Although these facts may be probative of whether the Gibbs family or LEA had notice of potentially adverse claims in the Park, they do not necessarily tend to prove that the Werchans were in fact asserting a claim of right that could ripen into the prescriptive easement that they claim here. The prescriptive easement that the Werchans now claim would entitle them to exclusive and unimpeded use of the portions of the Park where their dock's mooring cables are attached and their electric pole stands. The Wissen affidavit, like Mary Ann Werchan's testimony, tends to show that the Werchans were instead asserting a claim to use the Park in common with other residents. This is not the intention to appropriate the use of property as one's own "to the exclusion of all others" necessary to "support the statute of limitations." *Minh Thu Tran*, 213 S.W.3d at 915 (quoting *Ellis*, 620 S.W.2d at 571 (quoting *Wright*, 296 S.W.3d at 522)).

Additionally, LEA presented evidence—albeit hotly disputed—that dock owners moored at the Park acceded to a regime in which POPA restricted use of the Park solely to its dues-paying members. This included the testimony of Marlene Van Rens, a resident of Lakewood Estates since 1978 who, like Mary Ann Werchan, served as a POPA officer. Ms. Van Rens recounted that she purchased a dock around 1980 from one of the Werchans' original co-owners in their dock, B.E. Williams. According to Van Rens, Park access was limited solely to POPA dues-paying

15

members, all dock owners paid POPA dues, and that it was POPA that "allowed them to put their dock there." In fact, Van Rens added, B.E. Williams, the Werchans' co-owner in their dock, played an active role in enforcing the restrictions. Similarly, Jerry Rankin, a former LEA president, testified that all of the docks on the Park between 1995 to 2000 were there with LEA's permission.

Mary Ann Werchan, on the other hand, denied that POPA ever sought to exclude non-members (as opposed to non-property owners) from the Park, although she acknowledged that LEA undertook such efforts (to her dislike) in the late 1990s. However, consistent with the existence of the regime Van Rens described, the Werchans and each of their dock co-owners in 1979 were POPA dues-paying members. Furthermore, as noted, the Werchans were dues-paying POPA members each year between 1971 and 1993, and paid dues to LEA each year from 1997 to 2006.

From this evidence, the district court reasonably could have found that the Werchans—or at least their dock co-owners whose interests they now own—yielded to the authority claimed by POPA to require POPA membership in order to attach docks and otherwise use the Park. Although the Werchans question how POPA would have possessed any legitimate authority to do so, evidence that dock owners nonetheless acceded to that regime is further evidence that the Werchans were not asserting the sort of unqualified claim of an exclusive right in Park property that could ripen into the prescriptive easement they now claim. *See id.*

We hold that the evidence does not conclusively establish the elements of the Werchans' prescriptive easement claim, nor is the district court's failure to find those elements against the great weight and preponderance of the evidence. The district court did not err in rendering judgment that the Werchans take nothing on this claim.

16

**Express easement**

Although our holding concerning the Werchans' prescriptive easement claim resolves the controversy concerning whether they have rights to continue mooring their dock and maintaining their electric pole in the Park, the parties also present a broader dispute concerning the district court's judgment that the Werchans "have neither a fee interest nor an easement interest of *any type* in or to *any portion* of the [Park]" and that "*any* rights claimed by the Werchans under Paragraph 14 of the Restrictions"—which are not limited to maintaining their dock moorings and electric pole—"terminated along with the Restrictions as a whole on June 1, 1973." (Emphasis added.) The record reflects that, in addition to their specific dispute regarding the Werchans' dock, the parties contest whether, in light of the Restrictions, LEA has the power to exclude the Werchans from the Park entirely if they are not dues-paying members of the organization. Accordingly, we must address both issues. *See* Tex. R. App. P. 47.1.

The Lakewood Estates subdivision was originally developed in the 1940s by Joe T. Gibbs, Sr., from approximately 107.9 acres of land he owned. Gibbs filed the original plat in the Travis County real property records in 1947. This plat subdivided the land into 145 lots, dedicated several roads to the public, and, as noted, designated a strip of land fronting Lake Travis as "Park"—the Park at issue here. In 1948, Gibbs, as the sole owner of Lakewood Estates, recorded the "Restrictions." The "Restrictions" consisted of fifteen numbered paragraphs. The first twelve paragraphs contained restrictive covenants addressing such matters as use of the lots, spacing and size of structures, and utility easements. However, paragraph 14 of the "Restrictions" provided:

17

It is expressly stipulated that all purchasers and owners of tracts in Lakewood Estate shall have permanent use of the waterfront park and roads in Lakewood Estate, as shown on recorded plat of said addition. These roads and water front park are for the benefit and use of owners of property in Lakewood Estate, and the owners of property in subsequent additions to, and of Lakewood Estate.

Below this, paragraph 15, the concluding paragraph, stated, "These restrictions shall remain in force and shall remain effective until June 1st, A.D. 1973."

The parties dispute the proper construction of paragraph 14 vis-a-vis paragraph 15. The Werchans emphasize that paragraph 14 granted "*permanent* use of the waterfront park and roads in Lakewood Estates." "Permanent," they suggest, citing dictionary definitions, ordinarily denotes "existing perpetually," "everlasting," "intended to exist for a long, indefinite period of time without regard to unforeseeable conditions," or "long-lasting or nonfading"[7]—in other words, *not* terminating. As for the termination language in paragraph 15, the Werchans suggest that the provision refers to "[t]hese *r*estrictions" (a small "r" generic reference to things that restrict), not "the *R*estrictions" (the capitalized title of the instrument). Gibbs's choice not to capitalize "restrictions" in paragraph 15, they urge, indicates that he was referring only to provisions of "the *R*estrictions" that actually restrict use of lots, i.e., the restrictive covenants found in paragraphs 1-12. They distinguish paragraph 14 as a "grant," not a "restriction."

Further confirming that paragraph 15 was not intended to terminate every paragraph of the Restrictions, the Werchans suggest, is paragraph 13 of the Restrictions, which states:

---

[7] *See, e.g.*, *Webster's Third New International Dictionary* 1683 (1986).

18

It is expressly stipulated that all tracts that are below the 715 contour line, or any parts of said tracts below the 715 contour line, are sold subject to an easement held by the Lower Colorado River Authority for the purpose of impounding water. This easement is reserved by the Lower Colorado River Authority to prevent any liability on the part of said authority in the event of excessive high water.

The Werchans observe that the Restrictions' termination could not, by its own force, cause the LCRA easement referenced in paragraph 13 to terminate.

Based on this construction of the Restrictions, the Werchans conclude that paragraph 14 was not within the "restrictions" terminated by paragraph 15 of the Restrictions in 1973. In the alternative, the Werchans contend that if paragraph 14 and 15 irreconcilably conflict, paragraph 14, as a grant, must prevail over paragraph 15. *See Alford v. Krum*, 671 S.W.2d 870, 872 (Tex. 1984), *overruled on other grounds by Luckel v. White*, 819 S.W.2d 459 (Tex. 1991) (where provisions within a deed are inconsistent, court should give effect to the "controlling language of the deed and not allow ambiguities to destroy the key expression of intent included within the deed's terms"). In the further alternative, the Werchans urge that if the Restrictions are ambiguous as to whether paragraph 14 was terminated under paragraph 15, all of the extrinsic evidence of Gibbs's intent presented at trial indicated that he intended to grant Lakewood Estates property owners a permanent easement allowing "use of the waterfront park." In any case, the Werchans urge, their "permanent" right to use the Park as Lakewood Estates lot owners never terminated. LEA is subject to paragraph 14, the Werchans add, because their 1995 deed to the Park is expressly subject to "easements, right-of-ways and prescriptive rights" and "all presently recorded instruments, other than liens and conveyances, that affect the property."

19

LEA responds that paragraph 15 unambiguously means that all rights or limitations included within the Restrictions terminated on June 1, 1973. To give effect to paragraph 15, LEA reasons, "permanent" as used in paragraph 14 must necessarily mean only "for the entire life of the restrictions." It finds support for this view in paragraph 8, which contains a racially restrictive covenant—unenforceable today—providing that Lakewood Estates lots shall "never be sold, leased, or transferred" to anyone other than Caucasians. "Though the term 'never' suggests perpetuity," LEA urges, "Paragraph 8 is unarguably a use restriction and so subject to automatic termination under Paragraph 15 even under the Appellants' analysis." Thus, LEA concludes, any rights the Werchans would have possessed under the paragraph 14 of the Restrictions terminated on June 1, 1973.

Our disposition of these contentions, as the Werchans acknowledge, is controlled by the principles governing construction of restrictive covenants—the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied). In construing a restrictive covenant, a court's primary task is to determine the intent of the framers. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 658 (Tex. 1987). The language will be given its plain grammatical, ordinary and commonly accepted meaning, interpreted within the context of the entire instrument. *Travis Heights Improvement Ass'n v. Small*, 662 S.W.2d 406, 409 (Tex. App.—Austin 1983, no writ). We must construe restrictive covenants as a whole, give effect to every sentence, clause, and word of a covenant, and avoid constructions that would render parts of the covenants superfluous or inoperative. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003). "Like a contract, covenants are

20

unambiguous as a matter of law if they can be given a definite or certain legal meaning." *Pilarcik*, 966 S.W.2d at 478 (quotations omitted). "On the other hand, if the covenants are susceptible to more than one reasonable interpretation, they are ambiguous." *Id.* Whether a covenant is ambiguous and, if not, its legal meaning present questions of law that we review de novo. *Id.*; *Owens*, 241 S.W.3d at 129.

Applying these principles, we conclude that the Restrictions unambiguously provide that all of their provisions—including paragraph 14—would terminate on June 1, 1973. Although Gibbs did not capitalize the "restrictions" that are to terminate under paragraph 15, it is nonetheless significant that (1) Gibbs used "restrictions"—a term corresponding to the title of the instrument—and not a more limiting reference to particular provisions within the instrument, like "restrictive covenants" or "paragraphs 1-12"; (2) Gibbs used "*These* restrictions"—"these" is a demonstrative pronoun denoting a close spacial or temporal relationship to "restrictions"[8]—and not more remote alternatives like "the" restrictions or "any" restrictions; and (3) paragraph 15 is the concluding paragraph for the entire "Restrictions," following not only the restrictive covenants in paragraphs 1-12, but also paragraph 14. Given these choices of wording and the structure and ordering of the provisions, we conclude that "These restrictions" in paragraph 15 manifests intent to include all of the provisions of the Restrictions, including the paragraph 14 that immediately precedes it.

Contrary to the Werchans' argument, this construction of paragraph 15 does not imply that the Restrictions purport to terminate the LCRA easement referenced in paragraph 13. As

---

[8] C. Edward Good, *A Grammar Book* 133-35 (2002).

the Werchans acknowledge in their brief, paragraph 13 merely "advises the potential owner of a lot that the Lower Colorado River Authority (LCRA) has a flood easement up to the 715 foot contour line." Thus, while perhaps reinforcing that not all paragraphs of the "Restrictions" contained small-r restrictions, paragraph 13 did not purport to create the LCRA easement to which it refers. Consequently, paragraph 13's termination under paragraph 15 would not impact the LCRA easement itself.[9]

Although paragraph 14 does purport to grant "permanent" use of the Park, we cannot read that term in isolation. *See Owens*, 241 S.W.3d at 130. "Permanent," like "never" in paragraph 8, must be construed in context with paragraph 15. Together, paragraphs 14 and 15 manifest intent that Lakewood Estates lot owners would have "permanent" or uninterrupted use of the Park as long as the Restrictions were in effect. We addressed a similar issue in *Owens*. *See Owens*, 241 S.W.3d at 129-31. Appellees, neighboring landowners to the Owenses, argued that a restrictive covenant provision permitting alterations or amendments "at any time" authorized them to "amend" covenants that had previously expired under another provision stating the covenants "shall be in full force and effect for a period of twenty-five years." *See id.* at 130. Although we agreed that "at any time," if read literally and in isolation, might have authorized appellees'

---

[9] The concurrence suggests that paragraph 14's proviso that Lakewood Estates property owners "shall have permanent use of the waterfront park and roads in Lakewood Estates" is similarly advisory because both the Park and the roads appear on the recorded plat. It is true that the plat, as noted, designated the roads and dedicated them to the public. However, while the plat also designated a "Park" in the Lakewood Estates subdivision where houses and roads would not be constructed, the Werchans have not contended that the plat independently granted them a right to use the Park. Instead, they have relied solely on the 1948 Restrictions, which, we conclude, terminated under paragraph 15.

"amendment," we held that construction "is inconsistent with the deed restrictions as a whole and renders the explicit 25-year term superfluous." *Id.* "Read in its proper context," we concluded, "the provision necessarily means that the restrictions may be amended 'at any time' while they remain in effect." *Id.* Similarly, we must construe paragraph 14's "permanent" grant in the context of paragraph 15, and we cannot apply a construction of the former that would negate the latter's provision governing how long "[t]hese restrictions" will remain in effect. *See id.*

We hold that any rights the Werchans possessed under paragraph 14 terminated, along with the rest of the Restrictions, on June 1, 1973. Consequently, the district court did not err in rendering a judgment declaration to that effect. In light of this holding, we do not reach the Werchans' contingent second issue regarding LEA's adverse possession.

## CONCLUSION

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;
    Concurring Opinion by Justice Patterson

Affirmed

Filed:   August 21, 2009

23